No. 25-1495

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CHRISTOPHER JOHN BILLESDON,

*Plaintiff-Appellee,*

*v.*

WELLS FARGO SECURITIES, LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western
District of North Carolina, No. 3:23-cv-00160-FDW-SCR

## OPENING BRIEF OF APPELLANT

David Phillips
JONES DAY
4655 Executive Drive, Ste. 1500
San Diego, CA 92121
(858) 314-1121
davidphillips@jonesday.com

Jeffrey R. Johnson
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
jeffreyjohnson@jonesday.com

Christian Bashi
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3723
cbashi@jonesday.com

Terri L. Chase
JONES DAY
600 Brickell Ave., Ste. 3300
Miami, FL 33131
(305) 714-9722
tlchase@jonesday.com

*Counsel for Defendant-Appellant Wells Fargo Securities, LLC*

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and this Court's Local Rule 26.1, Defendant-Appellant Wells Fargo Securities, LLC states that it is a wholly owned subsidiary of EVEREN Capital Corporation, which is a wholly owned subsidiary of WFC Holdings, LLC, which in turn is a wholly owned subsidiary of Wells Fargo & Company. Wells Fargo & Company is a publicly held corporation (publicly traded on NYSE as WFC). No publicly held corporation owns 10% or more of Wells Fargo & Company's stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................ i

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 4

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE ........................................................... 6

    A.    Billesdon Works At Wells Fargo For 25 Years With A Well-Known Disability ........................................................ 6

    B.    The COVID-19 Pandemic Harms Asset-Backed Finance, And Billesdon Is Considered For A Reduction In Force ....................................................................... 7

    C.    Wells Fargo And Billesdon Dialogue About His Request To Work From Home ................................................... 9

    D.    Billesdon Is Added To A Reduction In Force ...................... 12

    E.    Wells Fargo Tables Billesdon's Accommodation Request After Return-To-Office Is Delayed Indefinitely .... 13

    F.    Wells Fargo Discharges Billesdon And Other Similarly Situated Employees In 2022 ............................................. 14

    G.    Procedural History ........................................................ 16

SUMMARY OF THE ARGUMENT ................................................... 17

STANDARDS OF REVIEW ............................................................. 19

ARGUMENT ................................................................................... 20

I.    WELLS FARGO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON ALL OF BILLESDON'S CLAIMS. ............... 20

    A.    ADA Failure-To-Accommodate Claim .............................. 21

    B.    ADA And North Carolina Disability-Discharge Claims ..... 31

    C.    ADA Retaliation Claim .................................................. 39

# TABLE OF CONTENTS
### (continued)

**Page**

    1.    The Evidence Demonstrates Wells Fargo Discharged Billesdon For Non-Retaliatory Business Reasons ...................................................... 40

    2.    No Evidence Suggests Wells Fargo's Reasons Were Pretextual. ....................................................... 46

II.    WELLS FARGO IS ENTITLED TO REMITTITUR OR A NEW TRIAL ON BACK PAY AND FRONT PAY. ......................................................... 53

    A.    The Jury's Back Pay Award Far Exceeds Any Amount Supported By The Record. ................................................. 54

    B.    The Jury's Front Pay Award Is Foreclosed By Billesdon's Subsequent Employment History. .................... 60

III.    THE DISTRICT COURT'S AWARD OF "CONTINU[ING]" STATE INTEREST SHOULD BE VACATED...................................................... 65

CONCLUSION ................................................................................. 68

STATEMENT REGARDING ORAL ARGUMENT .............................. 70

CERTIFICATE OF COMPLIANCE...................................................... 71

CERTIFICATE OF SERVICE.............................................................. 72

-iii-

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alston v. Holy Cross Health, Inc.*,
No. CV DLB-20-2388, 2023 WL 2743332
(D. Md. Mar. 31, 2023).......................................................................26

*Andrews v. Primus Telecommc'ns Group, Inc.*,
107 F. App'x 301 (4th Cir. 2004) (per curiam) ................................. 43

*Batson v. Salvation Army*,
897 F.3d 1320 (11th Cir. 2018)................................................. *passim*

*Cable v. Starbucks Corp.*,
2:20-CV-10931-JLS-AS, 2023 U.S. Dist. LEXIS 50784
(C.D. Cal., Mar. 24, 2023) ................................................................ 30

*Carter v. Ball*,
33 F.3d 450 (4th Cir. 1994)......................................................... 39, 50

*Cline v. Wal-Mart Stores, Inc.*,
144 F.3d 294 (4th Cir. 1998)..................................................... *passim*

*Cowgill v. First Data Techs., Inc.*,
41 F.4th 370 (4th Cir. 2022) ..................................................... *passim*

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*,
423 F. App'x 314 (4th Cir. 2011).......................................................29

*Doe v. Fairfax Cnty. Sch. Bd.*,
1 F.4th 257 (4th Cir. 2021) ................................................... 19, 20, 21

*Dominic v. Consolidated Edison Co. of New York, Inc.*,
822 F.2d 1249 (2d Cir. 1987) ................................................ 61, 62, 63

-iv-

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Dotson v. Pfizer, Inc.*,
558 F.3d 284 (4th Cir. 2009)................................................... 61, 62, 64

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
145 F.3d 653 (4th Cir. 1998)........................................................ 34, 42

*Duke v. Uniroyal Inc.*,
928 F.2d 1413 (4th Cir. 1991)............................................................ 61

*EEOC v. Consol Energy, Inc.*,
860 F.3d 131 (4th Cir. 2017)........................................................ 64, 65

*Eschert v. City of Charlotte*,
No. 3:16-CV-295-FDW-DCK, 2017 WL 3840275
(W.D.N.C. Sept. 1, 2017).................................................................. 66

*Ford Motor Co. v. E.E.O.C.*,
458 U.S. 219 (1982)..................................................................... 63, 64

*Forest Sales Corp. v. Bedingfield*,
881 F.2d 111 (4th Cir. 1989)............................................................. 66

*Franchina v. City of Providence*,
881 F.3d 32 (1st Cir. 2018) .............................................................. 32

*Gehring v. Case Corp.*,
43 F.3d 340 (7th Cir. 1994)......................................................... 32, 39

*Hernandez v. Yellow Transp., Inc.*,
670 F.3d 644 (5th Cir. 2012)............................................................. 50

*Hitachi Credit Am. Corp. v. Signet Bank*,
166 F.3d 614 (4th Cir. 1999)............................................................. 66

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hunter v. Town of Mocksville,*
   897 F.3d 538 (4th Cir. 2018) ................................................................ 61

*Jacobs v. N.C. Admin. Off. of the Courts,*
   780 F.3d 562 (4th Cir. 2015) ......................................................... 34, 36

*Jimenez v. DaimlerChrysler Corp.,*
   269 F.3d 439 (4th Cir. 2001) ............................................................... 28

*Kelly v. Town of Abingdon,*
   90 F.4th 158 (4th Cir. 2024) ...................................................... *passim*

*Keyes L. Firm, LLC v. Napoli Bern Ripka Shkolnik, LLP,*
   No. 19-2173, 2022 WL 3099848 (4th Cir. Aug. 4, 2022) .............. 20, 67

*Kingery v. Quicken Loans, Inc.,*
   629 F. App'x 509 (4th Cir. 2015) (per curiam) ....................... 42, 43, 47

*Knussman v. Maryland,*
   272 F.3d 625 (4th Cir. 2001) ............................................................... 54

*Koster v. Trans World Airlines, Inc.,*
   181 F.3d 24 (1st Cir. 1999) .......................................................... 54, 56

*Laird v. Fairfax Cnty.,*
   978 F.3d 887 (4th Cir. 2020) ............................................................... 39

*Lashley v. Spartanburg Methodist Coll.,*
   66 F.4th 168 (4th Cir. 2023) ............................................................... 39

*McDowell v. Massey Auto,*
   749 F. App'x 917 (11th Cir. 2018) (per curiam) ................................. 32

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Moore v. Regents of Univ. of Cal.*,
248 Cal.App.4th 216 (Cal. Ct. App. 2016) ........................................ 30

*Myrick v. Prime Ins. Syndicate, Inc.*,
395 F.3d 485 (4th Cir. 2005) ............................................................ 19

*Noel v. Artson*,
641 F.3d 580 (4th Cir. 2011) ........................................................... 28

*Ortiz v. Werner Enter., Inc.*,
834 F.3d 760 (7th Cir. 2016) ........................................................... 32

*Perdue v. Sanofi-Aventis U.S., LLC*,
999 F.3d 954 (4th Cir. 2021) ........................................................... 31

*Price v. City of Charlotte, N.C.*,
93 F.3d 1241 (4th Cir. 1996) ..................................................... 19, 20

*Raynor v. G4S Secure Sols. (USA) Inc.*,
327 F. Supp. 3d 925 (W.D.N.C. 2018) ............................................. 67

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ........................................................................ 42

*Resendiz v. Exxon Mobil Corp.*,
72 F.4th 623 (4th Cir. 2023) ........................................................... 31

*Selenke v. Med. Imaging of Colo.*,
248 F.3d 1249 (10th Cir. 2001) ....................................................... 29

*Staley v. Gruenberg*,
575 F. App'x 153 (4th Cir. 2014) (per curiam) ................................ 50

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Staudner v. Robinson Aviation, Inc.,*
853 F. App'x 806 (4th Cir. 2021) (per curiam) ................. 54, 56, 57, 58

*Tartaro-McGowan v. Inova Home Health, LLC,*
91 F.4th 158 (4th Cir. 2024) ........................................................22

*United States v. Skrmetti,*
605 U.S. 495 (2025) ................................................................31

*Vandevender v. Blue Ridge of Raleigh, LLC,*
756 F. App'x 230 (4th Cir. 2018) ........................................ 20, 66, 67

*Williams v. Pharmacia, Inc.,*
137 F.3d 944 (7th Cir. 1998) .......................................................61

*Wilson v. Dollar Gen. Corp.,*
717 F.3d 337 (4th Cir. 2013) ................................................ 29, 30

**STATUTES**

28 U.S.C. § 1291 ................................................................................5

28 U.S.C. § 1331 ................................................................................4

28 U.S.C. § 1367 ................................................................................4

28 U.S.C. § 1961 ....................................................................... 66, 67

42 U.S.C. § 1981a ..........................................................................17

42 U.S.C. § 12112 ................................................................ 21, 23, 31

42 U.S.C. § 12203 ..........................................................................39

Cal. Gov. Code § 12940 ..................................................................30

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

N.C. Gen. Stat. § 24-5.................................................................. 17, 65, 66

N.C. Gen. Stat. § 143-422 ................................................................... 31

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50 ................................................................................. 19

Fed. R. Civ. P. 59 ................................................................................. 20

## INTRODUCTION

Like many businesses during the COVID-19 pandemic, Wells Fargo faced a market in steep decline. Its asset-backed finance division went downhill in the second half of 2021 after the federal government signaled it would pare down emergency support for financial markets. Looking to reduce costs, Wells Fargo began identifying certain highly paid managing directors in that division as candidates for reductions in force. One of those directors was Christopher Billesdon.

Billesdon has had a disability all his adult life—a paralyzed bladder and colon—that periodically requires prompt and direct access to bathrooms. When Wells Fargo announced in the summer of 2021 that it would be implementing a return-to-office policy in the fall, Billesdon requested an accommodation to work from home. The company went back and forth with him on potential in-office accommodations because its managers had seen how work from home affected productivity during the pandemic. They ultimately tabled Billesdon's request once the return-to-office policy was delayed indefinitely thanks to the omicron variant.

-1-

During the same period, Billesdon's managers moved forward with the prior plan to cut costs through reductions in force. They initiated a business case for discharging one other director, and then added Billesdon to that business case on December 6, 2021—all *before* knowing his position that no in-office accommodation would suffice. Billesdon and the other director were notified of their discharge in February 2022; two additional directors were discharged later that year.

A jury found that Wells Fargo had violated the ADA and North Carolina law based on little more than the account above. To make matters worse, the jury then awarded Billesdon *$22 million* in damages, including more back pay than he even asked for and a windfall on front pay despite his voluntarily taking a pay cut after being discharged. The district court added to the miscues when imposing state prejudgment interest by ordering that such interest "will continue until the judgment is satisfied." This Court should correct those errors.

*First*, Wells Fargo is entitled to judgment as a matter of law (or a new trial) on each claim. Billesdon's failure-to-accommodate claim fails because the undisputed evidence shows that Billesdon was never denied an accommodation he needed while working at Wells Fargo; like most

-2-

other employees, he remained entirely remote. Tabling an employee's request for an accommodation they may want sometime in the future—but ultimately never need—does not violate the ADA.

Billesdon's disability-discharge theory fails because there is no evidence whatsoever that could support a finding that Billesdon's disability was a but-for cause of his discharge. If Billesdon had not been disabled, yet still requested to work 100% remotely for a non-disability reason, both sides at trial agreed he still would have been discharged—whether because of a reduction in force due to negative business conditions (Wells Fargo's position) or because of the work-from-home request (Billesdon's position). As a matter of law, then, Billesdon pressed a retaliation theory, not a disability-discharge theory, and should not have recovered for the latter.

He should not have recovered for the former either, because the evidence does not support a finding that his accommodation request was a but-for cause of his discharge. Even before Billesdon requested an accommodation and well before his managers knew of that request, they considered him as a potential candidate for a reduction in force. And even after his discharge, they laid off more employees who were

-3-

otherwise similarly situated but who had not requested an accommodation. Billesdon's contrary arguments rest on speculation.

*Second,* if any of the liability verdict survives, Wells Fargo is entitled to remittitur or a new trial on back pay and front pay. The back pay award went far beyond the evidence and even what Billesdon requested. The front pay award was foreclosed by Billesdon's subsequent employment history.

*Third*, the Court should also correct the district court's misstep in ordering postjudgment interest under state law in the guise of "continu[ing]" prejudgment interest. Postjudgment interest is governed by federal law, not state law.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Billesdon's ADA and ADEA claims under 28 U.S.C. § 1331 because those claims arise under the laws of the United States. JA0023, JA0039-0042. The court had supplemental jurisdiction under 28 U.S.C. § 1367(a) over Billesdon's wrongful discharge claim under North Carolina law because that claim is related to his federal claims such that it forms part of the same case or

controversy. JA0042-0043. The district court entered final judgment in Billesdon's favor on July 29, 2024. JA4080.

On August 26, 2024, Wells Fargo timely moved for judgment as a matter of law, a new trial, and to alter the judgment. JA4081. Billesdon moved to amend the judgment on the same date. JA4113. The district court granted the motions in part and denied them in part, amending the judgment on March 31, 2025. JA4203. Wells Fargo filed a timely notice of appeal from that order on April 24, 2025. JA4204-4205. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Wells Fargo is entitled to judgment as a matter of law or a new trial on all claims.

2. Whether Wells Fargo is entitled to a remittitur or a new trial on back pay and front pay.

3. Whether the district court's award of continuing state-law interest after the date of the judgment should be vacated.

-5-

## STATEMENT OF THE CASE

### A.  Billesdon Works At Wells Fargo For 25 Years With A Well-Known Disability

Christopher Billesdon began working for Wells Fargo (or its predecessors) in 1997, first as an intern, then as a bond salesman, and eventually as a managing director in the company's asset-backed finance business.  JA0438-0439, JA0442 (Billesdon); JA0727-0729 (Doyle).  Wells Fargo's asset-backed finance business acts as an intermediary between bond purchasers and sellers, pricing risk and executing trades typically for large institutional clients.  JA0727-0728 (Doyle).

During his time at Wells Fargo, Billesdon managed a disability caused by falling and breaking his back at age 18.  JA0432-0433, JA0439-0440 (Billesdon).  The fall left him with a paralyzed bladder and colon.  JA0435 (Billesdon).  For the first 20 years at the company, Billesdon managed his disability by taking medication to loosen his muscles and then pushing down on his bladder to urinate and pass bowel movements.  JA0439-0440 (Billesdon).  He adopted a new protocol in 2017, using a catheter to urinate and laxatives every few days to pass bowel movements.  JA0446-0449 (Billesdon).

-6-

Billesdon's coworkers and managers were aware of his disability and its effect on his bathroom needs. JA0441, JA0444, JA0451 (Billesdon). Jennifer Doyle—a longtime friend and the head of all spread products in late 2021—knew of Billesdon's condition for at least a decade. JA0722-0725. Christopher Iannuzzi—the head of asset-backed finance in late 2021—knew of Billesdon's condition within 5 years of meeting him in 2013. JA0803; JA0836-0838. And John Templeton—the head of asset-backed-finance sales in late 2021, JA0730 (Doyle)—knew of Billesdon's disability before becoming aware of any accommodation requests. JA0863 (Templeton). In 2017, Billesdon specifically told Iannuzzi the details of his new protocol to explain why he would "sporadically" need to be "off[] the desk" while at work. JA0449 (Billesdon).

## B. The COVID-19 Pandemic Harms Asset-Backed Finance, And Billesdon Is Considered For A Reduction In Force

Like everyone else, Wells Fargo was not spared from the economic effects of COVID-19. The pandemic put the markets into a "free fall" after March 2020. JA0735 (Doyle). Wells Fargo's entire business was losing billions of dollars by the day, and there were some days where asset-backed finance on its own lost $100 million. JA0735. The federal

government ultimately stepped in to stabilize the markets for a time. JA0736-0737.

That intervention helped Wells Fargo's asset-backed finance business through the first half of 2021, but then things changed. JA0737. The government began signaling in the spring and summer of 2021 that it would be pulling its COVID-19 relief support back from the market. JA0737-0738. Market actors "froze up," and Wells Fargo's asset-backed finance business "stopped making money" in the second half of 2021. JA0738-0743 (Doyle); *see* JA4069, (chart showing asset-backed-finance 2021 monthly revenues).

The economic downturn led management to begin assessing reductions in force. Early in the summer of 2021, Iannuzzi and Templeton discussed the need to "cut costs in sales specifically given the market landscape." JA0858 (Templeton). Given the high costs associated with managing directors in particular, Templeton later that summer suggested three specific candidates to Iannuzzi for reductions in force: John Abley, Christopher Billesdon, and John Fitzhugh. JA0858-0859; *see* JA0410 (Iannuzzi). Iannuzzi then discussed those same three candidates—who were "three of the most expensive people"—with Doyle

in late summer 2021. JA0745-0746. The managers selected Fitzhugh first, initiating a business case for a reduction in force on August 20, 2021. JA0823 (Iannuzzi); *see* JA3948.

Meanwhile, Wells Fargo announced in July 2021 that it planned to implement a return-to-office mandate in the fall. JA0355 (Davis). Billesdon was reportedly unhappy with the mandate; for instance, one former co-worker recounted Billesdon saying in the summer of 2021 that he was "never going back." JA0962-0963 (Robinette). *But see* JA1020 (Billesdon denying this statement). Billesdon discussed returning to the office with Doyle over lunch in 2021, where she expressed openness to his needing flexibility in the future. JA0762.

### C. Wells Fargo And Billesdon Dialogue About His Request To Work From Home

On August 31, 2021, Billesdon submitted a request to Wells Fargo's human resources department asking to be allowed to continue working from home when the company's return-to-office mandate took effect. JA0224-0225 (Davis); JA1293-1295. Billesdon's request ultimately was assigned to Joanne Davis, a senior accommodation management consultant, on October 21, 2021. JA1290; JA 0217 (Davis). Davis logged

detailed electronic notes of her communications with both Billesdon and his managers. JA1267-1291.

Davis's first conversation with any of the managers about Billesdon occurred on October 26, 2021, when she spoke with Templeton. JA1288; JA0261-0263 (Davis). Templeton wondered how the request would affect other members on Billesdon's team and whether it would affect Billesdon's substantial work travel obligations—he had long traveled roughly 25% of the time to meet clients. JA1288; JA0261-0263 (Davis). Davis then had a similar conversation with both Templeton and Iannuzzi on October 28, 2021, where they expressed concerns about how working from home would affect "communication and information exchange," explaining that they hoped things would go back to how they were before COVID-19. JA1288; JA0265-0266.

Templeton and Iannuzzi reiterated the same concerns in a conversation with Davis on November 1, 2021. JA1287. They worried about the effect working from home would have on Billesdon's ability to communicate quickly while executing trades and on his travel for work, since it was unclear whether he was also seeking an accommodation for work travel. JA1287. In light of those concerns, they wanted to know

how they could "push[] back." JA1287. Davis interpreted that comment as asking whether the managers would be bound by her recommendation or if they had independent decision-making authority. JA1287; JA0297 (Davis).

Davis then emailed back and forth with Billesdon to clarify whether he was seeking to perform his work travel responsibilities remotely. JA1284-1287. On November 3, 2021, Templeton and Iannuzzi reaffirmed their concerns in another conversation with Davis: remote work during the pandemic had not been as effective, they explained, and they did not believe Billesdon could be as productive working from home. JA1283. They declined Davis's recommendation to give Billesdon a trial period, saying they would prefer to give him two seats in the office, one by the bathroom. JA1283. They viewed Davis's recommendation as "delaying the inevitable" given how the business had lost productivity when employees worked from home during the pandemic. JA1283. The managers' posture did not raise any red flags for Davis, both because managers were being inundated with requests to work from home, and because she did not view the conversation as the end of the process. JA0306, JA0308.

-11-

Consistent with the managers' suggestion, Davis reported back to Billesdon on November 4, 2021, to ask if his health-care provider thought any in-office accommodation would suffice. JA1283. Davis told Billesdon that no accommodation was off the table. JA1283.

## D. Billesdon Is Added To A Reduction In Force

The asset-backed finance business's prospects continued to decline in the back half of 2021. JA0748-0749 (Doyle); JA4069. For that reason, management decided in October or November of 2021 that a second managing director would be selected for a reduction in force. JA0748-0749 (Doyle). Billesdon was the leading candidate for two reasons. First, he was the most expensive salesperson the business had, making "almost a million dollars more than anyone else." JA0750 (Doyle). Second, the managers felt that his responsibilities could be absorbed by others on his team. JA0412, JA0816-0820, JA0823-0824, JA0829, JA0833 (Iannuzzi); JA0739-0749, JA0751 (Doyle); JA0858-0859 (Templeton).

Given that the reasons for discharging Billesdon were materially identical to the reasons for discharging Fitzhugh, the managers revised the business case for discharging Fitzhugh to include Billesdon on December 6, 2021. JA1316. Iannuzzi checked with David Robinette, a

business manager for structured products, who confirmed that Billesdon could be added to the already-existing business case. JA0835 (Iannuzzi). Nothing about that process stood out to Robinette as unusual or contrary to Wells Fargo policy, as he later would explain that "typically," opening a new business case was unnecessary to expand the scope of a reduction in force, provided "the justification and business case is the same." JA0966-0968. When presented with a set of default timelines for new reductions in force circulated by human resources, Doyle similarly explained that those timelines were mere guidelines and were subject to exceptions. JA0676-0677.

### E. Wells Fargo Tables Billesdon's Accommodation Request After Return-To-Office Is Delayed Indefinitely

Billesdon got back to Davis with a letter from a health care provider supporting his request to work from home (rather than receive in-office accommodations) on December 6, 2021, which Davis then discussed with Doyle, Iannuzzi, and Templeton on December 9, 2021. JA0315-0318 (Davis); JA1275, JA1277 (Davis notes); JA0383, JA0849-0850 (Iannuzzi). Doyle had concerns about how work-from-home would fit with FINRA regulations requiring "in-house inspections," and she wanted to consult

with compliance partners to assess any regulatory risks. JA0766-0767; JA1272.

By late December 2021, Wells Fargo's return-to-office mandate was postponed indefinitely in light of the COVID-19 omicron variant after having been pushed back several times. JA0770-0771 (Doyle). On December 28, 2021, Templeton let Davis know that because of the indefinite postponement, the managers were "delaying making a final decision on [Billesdon's] request until a later date." JA1269. Davis relayed that update to Billesdon, explaining that the managers would evaluate the request when there was more clarity on the return-to-office mandate. JA1269. She followed up on January 10, 2022 to let Billesdon know that he would be able to open a new case once a definitive return-to-office date was in hand. JA1267. In the meantime, Billesdon was permitted to continue working from home. JA0520 (Billesdon); JA0771 (Doyle).

### F.   Wells Fargo Discharges Billesdon And Other Similarly Situated Employees In 2022

Consistent with the business case for the reduction in force, Wells Fargo notified both Fitzhugh and Billesdon on February 24, 2022 that they were being laid off. JA0480 (Billesdon); JA0388-0389 (Iannuzzi).

Wells Fargo went on to discharge two other managing directors in sales later in 2022: John Abley—the third managing director identified as a potential candidate in summer 2021—and Clay Glidewell. JA0757-0758 (Doyle); JA0836 (Iannuzzi). Just like Fitzhugh and Billesdon, Abley had been included in Templeton's initial list of candidates because he, too, was highly paid and his responsibilities could be absorbed by others. JA0746-0747 (Doyle). As a result of the reductions in force, four out of the seven managing directors in sales were discharged. JA0758 (Doyle).

Billesdon quickly secured a position at Brean Capital shortly after his discharge from Wells Fargo. *See* JA0580, JA0480-0481, JA0429-0430. He worked there for approximately 18 months before leaving Brean for a lower-paying commission-based position at Academy Securities. JA0430, JA0590 (Billesdon). But Wells Fargo remained on his mind. Robinette testified that in May or June of 2022, Billesdon encouraged Robinette to consider filing a claim against Wells Fargo based on his own disability "to stick it to them and to get paid." JA0971-0974. He told Robinette that he (Billesdon) was going to get paid in a lawsuit against Wells Fargo "even if it meant bending the truth." JA0971-0974. *But see* JA1020 (Billesdon denying these statements).

-15-

### G.  Procedural History

Billesdon filed his complaint against Wells Fargo on March 14, 2023, alleging claims under the ADA, the ADEA, and North Carolina law. JA0039-0043.  The district court granted Wells Fargo summary judgment on Billesdon's ADEA claim, and the remaining claims went to trial in July 2024.  JA0087.  The jury heard the details of Wells Fargo's reduction-in-force processes and its back-and-forth with Billesdon over his accommodation request.

On the issue of back pay and front pay damages, Billesdon's sole evidence consisted of testimony by his economics expert, Dr. Craig Moore. JA0629-0630.  Dr. Moore testified using a demonstrative containing his supplemental economic report dated July 16, 2024.  JA0623-0626, JA0628-0630; *see* JA1354.  The report—which the jury saw—opined that "the back pay damages suffered by Mr. Billesdon are approximately $4,225,558."  JA1356-1357.  Billesdon's counsel then urged the jury during closing statements to adopt Dr. Moore's damages figures, explaining "the answer that we are asking for for the backpay is the number that Dr. Moore gave you.  It's $4,225,558.  That is the backpay lost for Mr. Billesdon."  JA1201.

The jury ultimately returned a verdict for Billesdon on failure to accommodate under the ADA, disability-discharge under both the ADA and North Carolina law, and ADA retaliation. JA4076-4077. It awarded him $6 million in back pay and $14 million in front pay, $100,000 in emotional distress damages, $1 million in punitive damages under the ADA, and another $1 million in punitive damages under North Carolina law. JA4076-4077.

After dueling post-judgment motions, the district court amended the judgment to reduce the award of punitive damages under the ADA by $700,000 (via a remittitur that Billesdon accepted) to comply with the statutory cap in 42 U.S.C. § 1981a(b)(3)(D). JA4203; JA0019. It also amended the judgment to add 8% prejudgment interest on $6.1 million of the award under North Carolina law. JA4203. The court stated that the state prejudgment interest "will continue until the judgment is satisfied under N.C. Gen. Stat. Section 24-5(b)." JA4203.

## SUMMARY OF THE ARGUMENT

**I.**    Wells Fargo is entitled to judgment as a matter of law or a new trial on each of Billesdon's claims. *First*, his failure-to-accommodate theory fails because the undisputed evidence shows that Billesdon was

-17-

never denied an accommodation he needed while working at Wells Fargo. *Second*, Billesdon's disability-discharge theory fails because there is no evidence whatsoever that could support a finding that Billesdon's disability was a but-for cause of his discharge. He still would have been discharged if he had not been disabled, even on his own telling at trial. *Third*, Billesdon's retaliation theory fails because the evidence does not support a finding that his accommodation request was a but-for cause of his discharge. He was considered a candidate for a reduction in force even before his managers knew of his accommodation request, and Wells Fargo laid off additional similarly situated employees after his discharge for the same business reasons.

**II.** If the Court allows any of the liability verdict to stand, Wells Fargo is entitled to a remittitur or a new trial on back pay and front pay. The jury's award of $6 million in back pay materially exceeds the only relevant evidence of back pay at trial, and the only amount that Billesdon and his expert asked for. The jury's $14 million front pay award is unavailable because Billesdon voluntarily left a higher-paying job for a lower-paying one after his discharge, thus foreclosing his right to have Wells Fargo insure his future employment.

**III.** The district court erred in ordering that 8% prejudgment interest under North Carolina law "will continue until the judgment is satisfied." Interest accruing after judgment is *postjudgment* interest, and postjudgment interest is governed by federal law, not state law.

## STANDARDS OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law *de novo* and the denial of a new trial for abuse of discretion. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 269, 270 (4th Cir. 2021). A movant is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50(b) "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1249 (4th Cir. 1996) (internal quotation omitted). The motion must be granted if, viewing the evidence in the light most favorable to the non-moving party, "a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005).

-19-

A new trial must be granted under Rule 59(a) where "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Doe*, 1 F.4th at 268 (quotation omitted). When reviewing a motion for a new trial, this Court may "weigh the evidence and consider the credibility of witnesses." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

This Court will reverse awards of postjudgment interest under state law even where the parties did not brief the issue below. *See Keyes L. Firm, LLC v. Napoli Bern Ripka Shkolnik, LLP*, No. 19-2173, 2022 WL 3099848, at *4 n.6 (4th Cir. Aug. 4, 2022); *Vandevender v. Blue Ridge of Raleigh, LLC*, 756 F. App'x 230, 233 (4th Cir. 2018).

## ARGUMENT

### I. WELLS FARGO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON ALL OF BILLESDON'S CLAIMS.

Billesdon failed to adduce sufficient evidence on an "essential element" of each of his three theories of liability. *Price*, 93 F.3d at 1249 (quotation omitted). His failure-to-accommodate theory fails because the undisputed evidence shows that Billesdon was never denied an

accommodation while working at Wells Fargo. His disability-discharge theory fails because there is no evidence whatsoever that could support a finding that Billesdon's disability was a but-for cause of his discharge. And his retaliation theory fails because the evidence does not support a finding that his accommodation request was a but-for cause of his discharge. At the very least, the verdict on each count was "against the clear weight of the evidence." *Doe*, 1 F.4th at 268 (quotation omitted). This Court should reverse and grant Wells Fargo judgment as a matter of law on each claim, or, in the alternative, a new trial.

### A.    ADA Failure-To-Accommodate Claim

**1.**    In Count I of his complaint, Billesdon alleged that Wells Fargo violated 42 U.S.C. § 12112(b)(5)(A), which forbids covered entities from "not making reasonable accommodations to the known physical or mental limitations" of qualified employees with a disability, unless those accommodations would impose an undue hardship on the business. JA0040-0041. By its terms, that claim required Billesdon to establish that Wells Fargo in fact did not provide a reasonable accommodation for his disability. *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022); *see* JA1146 (jury instructions properly including this element).

But Billesdon was allowed to work from home from the time he asked for an accommodation until his employment was terminated, meaning he never demonstrated "a specific instance in which [he] needed an accommodation and was denied one." *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018).

To start, the evidence is undisputed that Billesdon was allowed to work 100% remotely from home during the entire period between his accommodation request and his discharge. "[E]verybody was working at home during COVID." JA0243 (Davis). Although Wells Fargo had planned to implement a return-to-office mandate, it was "delayed indefinitely" in December 2021 with the rise of the omicron variant. JA0770 (Doyle). As a result, Billesdon was discharged "before return[] to office came" into effect, JA0520 (Billesdon), and he "never" had to return to the office before being laid off, JA0771 (Doyle); *see* JA1269. To be sure, *all* Wells Fargo employees were allowed to work from home during this period, JA0243 (Davis), but the fact that other, non-disabled employees received similar accommodations is neither here nor there. *See Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 169 (4th Cir. 2024).

Billesdon has insisted that Wells Fargo nonetheless failed to accommodate his disability because he was requesting to work from home in the *future* once Wells Fargo employees were required to "return to the office."  JA0710 (Billesdon's counsel); *see* JA0243  (counsel asking Davis about this theory).  At the outset, the evidence shows that Wells Fargo did *not* deny any such request, instead engaging in an iterative process with Billesdon and telling him he could raise the issue again whenever the (indefinitely delayed) return-to-office policy was implemented.  *See infra*, 44-46.  More importantly, though, Billesdon's argument is wrong as a matter of law.

The ADA prohibits "not making" reasonable accommodations, 42 U.S.C. § 12112(b)(5)(A); there is no textual basis nor precedential support for deeming that prohibition violated where the employment relationship ends *before* any accommodation is to be "ma[de]."  To the contrary, the Eleventh Circuit considered and rejected Billesdon's exact argument in *Batson*, 897 F.3d 1320.

In *Batson*, an employee of The Salvation Army (TSA) sought an accommodation from the organization to adjust her travel schedule and to allow her occasionally to telecommute.  *Id.* at 1326.  She observed the

-23-

relevant formalities and supported the request with evidence, submitting an ADA questionnaire completed by her physician. *Id.* Human resources then informed her that her supervisors had denied the request. *Id.* A week later, the employee went on leave under the Family and Medical Leave Act for six weeks. *Id.* When she returned, she was told her position had been eliminated, and her employment was terminated shortly thereafter. *Id.* The employee later sued the organization for (among other things) failure to accommodate under the ADA, and the district court granted summary judgment for TSA. *Id.* at 1322.

The Eleventh Circuit agreed with the district court that the employee had "advanced no evidence establishing that TSA failed to accommodate her disability." *Id.* at 1326. "The problem" for her failure-to-accommodate claim, the Court explained, was that she offered "no evidence that before her FMLA leave and her termination she needed either of the accommodations she previously had requested generally." *Id.* It did not matter that the record "establishe[d] TSA's *intent* to deny her an accommodation." *Id.* (emphasis added). "[W]ithout evidence of a specific instance in which she *needed* an accommodation and was denied one, she [could not] establish a failure to accommodate." *Id.* (emphasis

-24-

added). Put differently, because the need for the accommodation never actually arose before the employee's discharge, she "was never actually denied any request for an accommodation." *Id.* at 1327 (quotation omitted).

Billesdon's failure-to-accommodate-in-the-future claim fails for the same reason. Even if Wells Fargo had in fact denied Billesdon's request to be accommodated for sometime in the future when he (and others) had to return to the office (it did not), Billesdon never actually "needed" that accommodation and "was denied one." *Id.* at 1326. Indeed, Billesdon's argument is even weaker than the employee's in *Batson*, because Billesdon received *the exact arrangement he wanted*—fully remote work—the entire time between his request and his discharge. It does not matter why Billesdon received that arrangement, only that he did.

**2.** The district court rejected *Batson*'s approach, but it provided no sound reason for doing so. The court thought the evidence "made clear [Billesdon] never received his requested accommodation" because "Davis closed the request without a resolution," leaving Billesdon "to wonder what would happen when Wells Fargo's return-to-office plan was executed, and when." JA4196 (internal quotation omitted).

-25-

Again, though, it is undisputed that Billesdon was permitted to work from home all the way up to his discharge. JA0520 (Billesdon); JA0771 (Doyle); *see* JA1269. So he never "received" his requested accommodation only in the sense that there was never any occasion for him to actually need it. And "wonder[ing] what would happen" with an employer's *future* accommodation decision is not the same thing as being denied an accommodation. Or as one court in this Circuit put it, "[t]he speculative possibility of being denied an accommodation in the future is not enough to sustain a failure-to-accommodate claim." *Alston v. Holy Cross Health, Inc.*, No. CV DLB-20-2388, 2023 WL 2743332, at *10 (D. Md. Mar. 31, 2023) (concluding that because plaintiff "was never forced to work in negative pressure isolation room after the policy change… he was never actually refused an accommodation").

The district court also thought the jury could have doubted the credibility of Wells Fargo's witnesses and could have found in Davis's notes an "intention to refuse his accommodation request." JA4196. But again, intent to deny an accommodation cannot by itself show an actual failure to accommodate. Consider, for example, if Billesdon had not been discharged and had taken up Wells Fargo's invitation to ask for an

-26-

accommodation once the return-to-office policy took effect. *See* JA1268 (Davis notes on 01/10/22 email). If Wells Fargo had then chosen to *grant* the accommodation—allowing Billesdon to continue working from home without any interruption—Wells Fargo could still be liable under the district court's approach if the company had intended to deny the accommodation in the past. That cannot be right. *Batson* thus provides the correct rule: even where the record "establishes… intent to deny [an] accommodation," that intent matters only if there is actually an occasion for the accommodation and the employer denies it. 897 F.3d at 1326.

**3.** For his part, Billesdon attempted to salvage his failure-to-accommodate claim in a few ways in his post-trial briefing, but none succeeds. *First*, Billesdon tried to distinguish *Batson* on the theory that Billesdon had submitted "ample evidence that he needed the accommodation he requested." JA4146. Of course, the only sense in which Billesdon "needed" a work-from-home accommodation *while already working from home* during COVID was for the future, and that forward-looking "need" was exactly what *Batson* considered and rejected. *See* 897 F.3d at 1326-27 (noting employee's argument that TSA simply

"had no opportunity" to act on its decision to deny her request due to "timing of her FMLA leave and subsequent termination").

*Second*, Billesdon faulted Wells Fargo for not proposing to include *Batson* in the jury instructions. JA4146. But court decisions "are not jury instructions, nor are they meant to be." *Noel v. Artson*, 641 F.3d 580, 588 (4th Cir. 2011). And more importantly, the instructions already encompassed *Batson* because they asked the jury to determine whether Wells Fargo was liable for "failing to prov[ide]" a reasonable accommodation. JA1145. There can be no "failure to provide a reasonable accommodation" "without evidence of a specific instance in which [a plaintiff] needed an accommodation and was denied one." *Batson*, 897 F.3d at 1326-27.

*Third*, Billesdon attempted to defend the verdict on grounds of "unreasonable delay," "failure to engage in the interactive process," and "termination in lieu of accommodation"—which he contended are additional permissible theories of failure-to-accommodate liability. JA4147. But an otherwise unsupported verdict cannot be sustained on the basis of an alternative theory never submitted to the jury. *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 448 (4th Cir. 2001). The district

court rejected Billesdon's attempt to submit a freestanding claim for failing to engage in the interactive process, JA1129, and neither of his other two late-breaking theories were included in the instructions either. He cannot save the verdict by relying on them now.

None of Billesdon's new theories would support the verdict anyway. In this Circuit, an employer's failure to engage in an interactive process over accommodations is relevant on particular facts only insofar as it "result[s] in the failure to identify an appropriate accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 347 (4th Cir. 2013). Billesdon was never denied *any* accommodation he had occasion to need, so the interactive process is irrelevant.

The same goes for unreasonable delay. Wells Fargo is not aware of any case permitting an unreasonable-delay theory of liability where an employee requests only a *future* accommodation that ultimately is never needed. And courts that do recognize unreasonable-delay theories often reject them where an employer offers an alternative accommodation while evaluating an employee's request. *See, e.g.*, *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262-64 (10th Cir. 2001). Billesdon

received just that: he was permitted to work from home during the entire period that Wells Fargo was considering his request.

For his termination-in-lieu-of-accommodation theory, Billesdon invoked only authority applying California's Fair Employment and Housing Act. JA4147 (citing *Cable v. Starbucks Corp.*, No. 2:20-CV-10931-JLS-AS, 2023 U.S. Dist. LEXIS 50784, at \*25 (C.D. Cal. Mar. 24, 2023)). That theory of liability under California law, however, relies on the policies underlying the Act's freestanding interactive-process claim. *See Moore v. Regents of Univ. of Cal.*, 248 Cal.App.4th 216, 242-44 (Cal. Ct. App. 2016); Cal. Gov. Code § 12940(n). As this Court has recognized, the ADA provides no such claim. *See Wilson*, 717 F.3d at 347. And in any event, termination in response to an accommodation request is already the thrust of Billesdon's ADA retaliation theory (which also fails, *see infra,* 39-53).

Neither Billesdon nor the district court have provided any reason for this Court to break with the Eleventh Circuit's approach in *Batson*. Wells Fargo is entitled to judgment as a matter of law (or alternatively, a new trial) because Billesdon advanced no evidence establishing that Wells Fargo actually failed to accommodate his disability.

-30-

### B. ADA And North Carolina Disability-Discharge Claims

1. Count I of Billesdon's complaint also alleged that Wells Fargo violated 42 U.S.C. § 12112(a), which forbids discrimination against qualified individuals "on the basis of disability" "in regard to… the… discharge of employees." JA0041. He alleged a materially identical theory under North Carolina General Statutes § 143-422 in Count III. JA0042. Both claims are governed by the same legal standards. *See Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 962 n.5 (4th Cir. 2021); JA1151 (instructing jury that elements for Billesdon's ADA disability-discharge claim and his claims under North Carolina law "are the same").

The essential element of Billesdon's disability-discharge claims required him to establish that his disability "was a 'but-for' cause of his termination." *Kelly v. Town of Abingdon*, 90 F.4th 158, 169 (4th Cir. 2024). The "traditional but-for causation standard" requires the adjudicator "to change one thing at a time and see if the outcome changes." *United States v. Skrmetti*, 605 U.S. 495, 520 (2025) (quotation omitted); *see Resendiz v. Exxon Mobil Corp.*, 72 F.4th 623, 629 (4th Cir. 2023). Here, that means Billesdon had the burden to show that he "would have kept his job" if "everything else had remained the same" except for

-31-

his disability. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *see Gehring v. Case Corp.*, 43 F.3d 340, 344-45 (7th Cir. 1994) (explaining how "everything else had remained the same" formulation best captures but-for causation); *McDowell v. Massey Auto*, 749 F. App'x 917, 919 (11th Cir. 2018) (per curiam) (similar); *see also Franchina v. City of Providence*, 881 F.3d 32, 53 (1st Cir. 2018) (explaining but-for causation requires plaintiff to show that "all else being equal," discrimination would not have occurred but for protected characteristic). And critically, Billesdon had to show that Wells Fargo "was motivated by his *disability*, not simply his protected action" of requesting an accommodation. *Kelly*, 90 F.4th at 170 (emphasis added).

Billesdon failed to make that showing. The trial record is unequivocal that if Billesdon had not been disabled, *yet still had requested to work from home 100% of the time* for some non-disability reason, he would have been discharged. Indeed, the parties essentially *agreed* on this dispositive point (though they disagreed on *why* Billesdon still would have been discharged).

Start with the direct evidence of the reasons for Billesdon's discharge. Wells Fargo's witnesses consistently testified that Billesdon

-32-

was included within a reduction in force for business reasons, not because he was disabled. *See* JA0424 (Iannuzzi testifying Wells Fargo selected Billesdon "based on two factors: Reducing costs and being able to absorb the team members' duties"); JA0829 (Iannuzzi) (same); JA0751 (Doyle testifying "[i]t was very much a cost decision"). Moreover, when Billesdon himself was asked by his counsel what had changed between him and the company by the end of 2021, he testified "[t]he only thing that changed was that I asked for an accommodation." JA0476.

The circumstantial evidence further confirms that Billesdon's disability was not a but-for cause of his discharge. Consider the timing. After becoming disabled when he was 18, Billesdon had worked for Wells Fargo and its predecessors for 25 years. JA0430; JA0432-0433. Before he left the Charlotte office in 2004, Billesdon's managers at the time were aware of his disability. JA0440-0441. His managers were also aware of his disability "at all times" after moving to California in 2004. JA0444.

Doyle, Iannuzzi, and Templeton specifically were each aware of Billesdon's disability long before he was laid off. *See* JA0725 (Doyle) (at least a decade); JA0836-0837, JA0838 (Iannuzzi) (within five years of meeting Billesdon in 2013); JA0863 (Templeton) (before becoming aware

of request for accommodation).  Without any direct evidence of disability discrimination, the "lengthy time lapse" between the relevant decisionmakers' knowledge of Billesdon's disability and his termination "negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

In light of the plain disconnect between Billesdon's disability and his discharge, his strategy during closing statements was to treat an alleged discharge because of his accommodation request as equivalent to an alleged discharge because of his disability.  *See* JA1188 (arguing Billesdon was a "target because of his disability" because Wells Fargo "d[idn't] want to accommodate [him]"); JA1192 ("And then fire him because they did [sic] want to accommodate.  That's unlawful discrimination.").    But those are legally distinct rationales. "[D]iscrimination and retaliation claims rely on different theories of motive."  *Kelly*, 90 F.4th at 170.  To prove a discrimination claim, Billesdon had to show that Wells Fargo "was motivated by his *disability*, not simply his protected action."  *Id.* (emphasis added); *see Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 578 (4th Cir. 2015).

-34-

Indeed, while the jury's *retaliation* instruction required Billesdon to show only that he would not have been discharged "but for his accommodation request, that is, if he had not made the accommodation request," JA1164, the *disability-discharge* instruction further required him to show that he would not have been discharged "but for his disability, *that is, if he were not disabled*," JA1144 (emphasis added). And here, the jury could not reasonably have found that Billesdon would have kept his job if he was not disabled yet still had requested to work from home 100% of the time for some reason *other* than disability: *all* of the evidence proffered by *both* sides was to the contrary.

2.     The district court concluded otherwise in its post-trial order for two reasons, neither of which carries the day. *First*, the district court thought the jury could have doubted that Wells Fargo discharged Billesdon for business reasons. JA4197. The court pointed specifically to Doyle's testimony about an email sent by Wells Fargo's human resources department describing timelines for reductions in force that did not align with Billesdon's process. JA4197; *see* JA0676-0678, JA1335. Though the email did not spell it out, Doyle explained that the timelines

in the message reflected guidelines rather than hard-and-fast rules, and that the timelines were subject to exceptions.  JA0676-0678.

That testimony in no way casts doubt on Wells Fargo's business reasons for discharging Billesdon.  *See infra*, 47-49.  But even if it somehow did, Doyle's testimony still would not provide evidence that Wells Fargo terminated Billesdon's employment because of *his disability* as opposed to *his accommodation request.*  Again, disability discharge and retaliation are two separate theories, and evidence of one will not suffice to prove a claim for the other.  *Kelly*, 90 F.4th at 170; *Jacobs*, 780 F.3d at 578.

*Second*, the district court thought that Davis's notes "indicated [Billesdon's] managers were skeptical about Plaintiff's ability to do his job despite his disability and expressed an intent to 'push back.'"  JA4197.  But the only skepticism reflected in Davis's notes was about whether Billesdon could do the job as well *while working full-time from home—* that is, while receiving the accommodation he requested.

In Davis's first meeting with the managers, their "specific concerns" were about "communication and information exchange."  JA1288.  The managers elaborated their "main concerns" in a subsequent meeting,

explaining that Billesdon working from home after the return-to-office mandate might affect team "communication" and work "travel." JA1287. They also wondered why Billesdon had not needed the accommodation earlier, JA1287, but that only shows they thought he was *fully capable* of performing his duties notwithstanding his disability. The managers later reaffirmed their belief that Billesdon could not "be as effective as a telecommuter or as productive." JA1283.

Those reasons are why Billesdon's managers "push[ed] back" on his accommodation request. JA1288. Davis's notes do not contain even a hint that the managers questioned Billesdon's ability to do his job because of his disability. The notes thus would not allow a reasonable jury to "infer animosity towards Plaintiff because of his disability." JA4197.

**3.** Billesdon's only record-based defense of his disability-discharge claims after trial was to say that his mitigation measures had changed in 2017. JA4149-4150. Billesdon's managers were not aware of the "additional measures" Billesdon began taking in 2017, he theorized, so the time between their full knowledge of his condition and their discharging him was not as lengthy. JA4149-4150.

-37-

Billesdon understates what his managers knew in 2017 and overstates what he told them in 2021. Billesdon testified that after repeatedly visiting the emergency room in 2017, he began using catheters to urinate and a laxative to trigger bowel movements. JA0446-0450. But Billesdon immediately notified his managers of those measures, "let[ting] them know" the vivid details to explain why he would "sporadically" need to be "off[] the desk" while at work. JA0449. And critically, one of those managers was Iannuzzi. JA0449; *see* JA0838.

In 2021, the documentation Billesdon provided in support of his accommodation request described the details of his condition but did not explain that those conditions had changed in 2017. *See* JA1323; JA1294. Billesdon's managers thus had no reason to think in 2021 that his conditions were materially different than what the managers had known for years. Doyle had known Billesdon for decades, as they shared a beach house early in their twenties, played golf together, visited each other's homes, and traveled together for work. JA0724. Iannuzzi also interacted socially and at work events and conferences with Billesdon for years. JA0837. Billesdon's post-hoc theory that some new detail about his

-38-

condition led his long-time colleagues suddenly to turn on him because of his disability is both fanciful and wholly unsupported by the record.

Because Billesdon failed to show that Wells Fargo would have kept him on if he had requested the same accommodation without being disabled, his disability-discharge claims fail for lack of but-for causation. *See Kelly*, 90 F.4th at 169-71; *Gehring*, 43 F.3d at 344. Wells Fargo is therefore entitled to judgment as a matter of law on those claims, or in the alternative, a new trial.

## C. ADA Retaliation Claim

The ADA "prohibits retaliation against employees who seek the Act's statutory protections." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (citing 42 U.S.C. § 12203(a)-(b)). As just discussed, the essential element of this claim required Billesdon to establish that his request for an accommodation "was a but-for cause" of his discharge. *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 176 (4th Cir. 2023); *see* JA1164 (jury instructions properly reflecting this element). Billesdon failed to do so because the record demonstrates that Wells Fargo discharged him for non-retaliatory business reasons, and no evidence suggests Wells Fargo's reasons were pretextual. *See Carter v. Ball*, 33

F.3d 450, 460 (4th Cir. 1994) (describing plaintiff's burden to show pretext).

### 1. The Evidence Demonstrates Wells Fargo Discharged Billesdon For Non-Retaliatory Business Reasons.

**a.** To start, all the *direct* evidence of the reasons for Billesdon's discharge—the contemporaneous documentation of the decision and the testimony of Billesdon's managers—shows that he would have been selected for a reduction in force even if he had not made his request for an accommodation. That evidence demonstrates the asset-backed-finance market was headed downhill in the second half of 2021, and Billesdon was selected for a reduction in force to cut costs. JA1309 (Business Case for RIF); JA0412, JA0816-0820, JA0823-0824, JA0829, JA0833 (Iannuzzi); JA0739-0749, JA0751 (Doyle); JA0858-0859 (Templeton).

Doyle expressly testified that the reduction-in-force process and the accommodation process in Billesdon's case had nothing to do with one another. JA0696. And Iannuzzi and Doyle consistently attributed Billesdon's discharge solely to business reasons unrelated to any accommodation request. *See* JA0416, JA0424, JA0829 (Iannuzzi);

-40-

JA0751 (Doyle). Templeton also perceived no animosity in Iannuzzi toward Billesdon during their discussions about including him in the reduction in force. JA0860. Indeed, even Davis—whom Billesdon called as his first star witness—testified that the discharge decision was separate from the accommodations process with which she was involved. JA0372.

**b.** The *circumstantial* evidence about the reasons for Billesdon's discharge points the same way. Three categories of evidence, in particular, confirm that Billesdon's accommodation request was not a but-for cause of his discharge.

*First*, Billesdon was being considered for a reduction in force *before* he requested an accommodation and *before* his managers ever knew about that request. It is undisputed in the record that Iannuzzi and Templeton discussed the potential need for reductions in force in the early summer of 2021, and that Templeton suggested Billesdon's name to Iannuzzi in the late summer. JA0858-0859 (Templeton), JA0383-0384 (Templeton), JA0410 (Iannuzzi). It is also clear that Billesdon did not request an accommodation until August 31, 2021, JA1293, and that Templeton and Iannuzzi did not learn of Billesdon's accommodation

-41-

request until October 22, 2021 at the earliest. JA1290-1291; JA0257-0258 (Davis); JA0860 (Templeton); JA0839 (Iannuzzi). By definition, then, Billesdon's accommodation request cannot have played any role in the decision to begin considering him for a reduction in force, which is compelling evidence that it did not play a role in eventually selecting him. *See Dowe*, 145 F.3d at 657.

The district court resisted that conclusion on the theory that no "documentary evidence" showed Iannuzzi and Templeton had already begun considering Billesdon as a candidate for discharge in the summer of 2021. JA4198. As the court saw it, "[i]t appears the jury did not credit their testimony, particularly in the face of Davis's near-contemporaneous notes." JA4198. The court was mistaken both on the law and on the facts.

As a legal matter, even where the evidence must be considered in the light most favorable to the non-moving party, witness testimony "must be taken as true" when no evidence calls its veracity into question. *Kingery v. Quicken Loans, Inc.*, 629 F. App'x 509, 516 (4th Cir. 2015) (per curiam) (internal quotation omitted) (rejecting overly broad reading of language in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

-42-

137 (2000)); *see Andrews v. Primus Telecommc'ns Group, Inc.*, 107 F. App'x 301, 305 n.4 (4th Cir. 2004) (per curiam) (same for judgment as a matter of law, considering trial testimony by defendant's witnesses).

On the facts, no evidence—including Davis's notes—called into question Templeton and Iannuzzi's testimony about considering Billesdon for a reduction in force earlier in 2021. The district court did not explain how Davis's notes could be read to suggest anything either way about Templeton and Iannuzzi's previous discussions, and they do not: the notes begin on October 21, 2021, when Davis received Billesdon's accommodation request, and they do not mention the reduction-in-force process at all. *See* JA1267-1291. As Davis testified, Wells Fargo's accommodation processes—the subject of her notes—are "separate" from its reduction-in-force processes. JA0372. The jury had no basis to disbelieve Templeton and Iannuzzi's account of their conversations before Billesdon submitted his accommodation request, so their testimony on this point "must be taken as true." *Kingery*, 629 F. App'x at 516.

*Second*, it is also undisputed in the record that Wells Fargo laid off additional employees similarly situated to Billesdon, *including after he*

-43-

*was discharged*—a passing strange thing to do if Wells Fargo simply used the reduction in force as an excuse to get rid of Billesdon. Specifically, Wells Fargo laid off Fitzhugh on the same day as Billesdon, JA0388-0389 (Iannuzzi); JA0480 (Billesdon), and Abley and Glidewell after Billesdon was discharged, JA0757-0758 (Doyle); JA0836 (Iannuzzi). The business case for discharging Fitzhugh rested on the same fundamentals as the rationale for discharging Billesdon—cost and ability to absorb responsibilities. JA0751 (Doyle); JA0824, JA0828-0829, JA0834 (Iannuzzi). Abley was included in Templeton's initial set of three suggested names (along with Fitzhugh and Billesdon) because he too was highly paid and his responsibilities could be absorbed. JA0746-0747 (Doyle). Wells Fargo thus laid off all three employees in the group initially considered for a reduction in force and still one more after that. That consistent approach to layoffs—including of employees who evidently did not request accommodations—confirms Billesdon would have been laid off regardless of his request.

*Third*, the evidence shows that Wells Fargo remained open to working with Billesdon to find a suitable accommodation, so there was no reason for Wells Fargo to preemptively discharge Billesdon to avoid

-44-

making an accommodation. The preliminary delay in initiating those proceedings was due in part to Billesdon's letter initially sitting in a spam folder, JA0463 (Billesdon), and in part to the large backlog in accommodations requests caused by return-to-work policies, JA1289 (Davis notes); JA0260, JA0355-0358 (Davis). From there, Davis had frequent conversations with Billesdon and relayed Iannuzzi and Templeton's questions about his ability to travel for work. JA0298-0299 (Davis); JA1287-1288 (Davis notes). Iannuzzi and Templeton thought that 100% remote work would harm effectiveness and productivity, so they proposed in-office alternatives. JA1283 (Davis notes); JA0304-0306 (Davis). Davis then relayed Iannuzzi and Templeton's questions about whether in-office accommodations would suffice. JA0309-0310.

It then took Billesdon about a month to send Wells Fargo additional medical opinions justifying his position that he could not work in-office at all (except for travel). JA0363 (Davis). Critically, his managers formally selected him for the reduction in force *before* they knew of those positions. *See* JA1316 (business case for RIF showing 12/6/21 revision adding Billesdon); JA0315-0318 (Davis affirming from her notes that she received Dr. Woodward's letter on 12/6/21, read it on 12/7/21, and

discussed it with managers on 12/9/21); JA1274, JA1276 (Davis notes showing the same); JA0383, JA0849-0850 (Iannuzzi testifying he learned of Billesdon's response on 12/9/21, after already deciding to include Billesdon in reduction in force).

Iannuzzi decided shortly thereafter that he would need to escalate Billesdon's request. JA1274 (Davis notes). Finally, with the onset of the omicron variant of COVID, Wells Fargo delayed its return-to-work policy indefinitely and told Billesdon that he could make a new request if and when a return-to-work policy was in fact implemented. JA0344, JA0337-0338 (Davis), JA1269. Wells Fargo's handling of Billesdon's request shows there was no need to terminate his employment preemptively to avoid an accommodation when a workable solution may have been right around the corner. *See* JA0535 (Billesdon testifying that a private office with a private bathroom would have been sufficient); JA0762 (Doyle testifying to previously expressing willingness to give Billesdon some flexibility once return-to-office began).

### 2. No Evidence Suggests Wells Fargo's Reasons Were Pretextual.

Against that wall of consistent evidence, Billesdon asked the jury to infer retaliation based on a few factors that he tried to portray as

suspicious. But none of them creates even smoke, let alone sufficient basis to find a fire when viewing the record as a whole.

**a.** Billesdon made much of the fact that he was added to an existing reduction in force that had already been initiated for Fitzhugh, resulting in Billesdon's discharge before what had been the expected return-to-work date. JA1186-1189. But Wells Fargo's managers credibly testified why that decision rested on multiple business reasons and was fully consistent with Wells Fargo's reduction-in-force policies. Doyle explained that COVID had put Wells Fargo's asset-backed-finance division into a freefall until the federal government stepped in to stabilize the markets. JA0735-0739. (Doyle). But by 2021, the government began signaling its intent to step back, which then led to another severe downturn for asset-backed finance. *Id.* Doyle added Billesdon to the already-pending reduction in force because the deteriorating market conditions after Fitzhugh's initial selection made it necessary to make further cuts, and discharging both employees on the same date would mitigate harm to morale. JA0748-0749, JA0751.

Doyle also explained why Billesdon's counsel was wrong to posit that he had improperly been added to a "closed" reduction in force for

-47-

Fitzhugh: reductions in force are not "closed" until the date of the employee's notice of discharge because they can be changed all the way up until that date. JA0676, JA0680. She also explained that timelines for reductions in force provided by the human resources department— something Billesdon attempted to seize upon—served as guidelines subject to exceptions rather than hard-and-fast policies. JA0676-0677. Doyle affirmed that Wells Fargo's approach to Billesdon's reduction in force followed all the company's own internal policies. JA0679.

Iannuzzi similarly explained that Billesdon was added to an existing reduction in force rather than to a new one because the business case for discharging him and Fitzhugh was the same, and to preserve morale. JA0834-0835. Iannuzzi then checked with Robinette to see if the current reduction in force for Fitzhugh could be revised to include Billesdon; Robinette confirmed that it could be. JA0835.

Robinette, who had worked on 75-100 reductions in force over five years at Wells Fargo, then testified that nothing stood out to him as unusual about Billesdon's business case process for a reduction in force, and that it was "pretty standard." JA0966-0967. He explained that adding another job code to an existing business case was permissible

under Wells Fargo's policies, and that "typically" it was not necessary to open a new business case to change the scope of a reduction in force—provided, as was true for Billesdon, "the justification and business case is the same." JA0967-0968.

In light of all this, the district court was simply wrong to say that "the jury also heard testimony [that adding Billesdon to the reduction in force] was contrary to Wells Fargo's own policies." JA4198. *No* witness testified to that effect, and as laid out above, *every* witness to address the question said Billesdon's reduction-in-force process complied with Wells Fargo's policies. The jury thus had no evidentiary basis for inferring anything untoward from the procedures Wells Fargo used to effectuate Billesdon's discharge.

**b.** Billesdon also argued after trial that the jury could infer pretext from the close temporal proximity between the time that Billesdon's managers "learned from Billesdon's physician that in-office accommodations would not be effective" and their decision to add Billesdon to the pending reduction in force. JA4151-4152. The district court similarly thought it important that Billesdon was added to the reduction in force "mere weeks" after Davis began working on his

-49-

accommodation request. JA4198. Here, too, both the facts and law cut in Wells Fargo's favor.

On the facts, Billesdon has the timeline backwards: while Davis received the letter from Dr. Woodward on December 6, 2021, she did not make Billesdon's managers aware of it until December 9—three days *after* they had formally added him to the reduction in force. *See* JA1316 (business case for RIF); JA0315-0318 (Davis); JA1274, JA1276; JA0383, JA0849-0850 (Iannuzzi). Billesdon's rejection of in-office accommodations thus played no role in their decision.

On the law, while "temporal proximity alone" may be enough to make out a prima facie case for discrimination or retaliation on extreme facts, it is "not sufficient" to demonstrate pretext and therefore the ultimate question of but-for causation. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014) (per curiam); *see id.* ("[B]ut for causation cannot be established by temporal proximity alone." (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012) (cleaned up)); *Carter*, 33 F.3d at 460 (holding temporal proximity sufficed for *prima facie* case of retaliation but that ultimately "[t]here [was] no evidence that [the employer's] non-discriminatory reasons were pretextual"). Billesdon

-50-

has no probative evidence to pair with his temporal proximity theory, so the timing of his being added to the reduction in force does not matter.

**c.** Billesdon also pointed the jury to Wells Fargo's overall income as evidence that there was no need to cut anyone other than Fitzhugh. JA0695-0696, JA1184. That theory, however, entirely failed to account for Doyle's detailed explanation of the decreasing revenues for Wells Fargo's asset-backed-finance group, which was the relevant business for evaluating the need to cut costs. That group "stopped making money" in the second half of 2021 after the federal government signaled it would level down its support of the market. JA0739. Billesdon's theory is also irreconcilable with the fact that Wells Fargo continued its cost-cutting measures by discharging two more managers—Abley and Glidewell— after Billesdon's layoff. JA0757-0758 (Doyle); JA0836 (Iannuzzi).

**d.** Last, Billesdon pointed to his historically favorable work performance as evidence against the purported business case for discharging him, and tried to minimize Wells Fargo's need to cut costs. JA1184. But favorable job performance did not matter: Billesdon's managers specifically sought to remove highly paid (not poorly performing) employees whose responsibilities could be absorbed by

remaining employees while accomplishing the same results—and the evidence shows they did. JA0424, JA0824 (Iannuzzi); JA0799-0800 (Doyle explaining that Wells Fargo thought another director right below Billesdon could make up Billesdon's value and that the director has done "incredibly well" since). Moreover, Brian Farrell, Billesdon's manager and mentor through mid 2020, explained why simply cutting discretionary bonuses rather than reducing headcount was no answer to the need to reduce costs: each employee costs Wells Fargo more than their compensation, and it is difficult to attract top talent if a company has a policy of slashing bonuses when times get tight. JA0985-0986.

*     *     *

Billesdon failed to present evidence that his accommodation request was the but-for cause of his discharge, so Wells Fargo is entitled to judgment as a matter of law on Billesdon's retaliation claim. Below, Billesdon resisted that argument on the theory that "resolution of the issue depends on assessment of the credibility of the witnesses." JA4153. As explained above, that is not true. But even if it were, this Court can and should "weigh the evidence and consider the credibility of witnesses" itself. *Cline*, 144 F.3d at 301.

-52-

The clear weight of the evidence favors Wells Fargo:  Billesdon's managers considered him for a reduction in force before they were aware of his accommodation request, they added him to the reduction in force before learning his position that no in-office accommodation would work, the reduction in force process was consistent with normal practice, and, perhaps most importantly, they *discharged three other similarly situated employees alongside and after discharging Billesdon.*  That is not the stuff of a sustainable retaliation claim, let alone one that should survive the more modest request for a new trial.

## II.    WELLS FARGO IS ENTITLED TO REMITTITUR OR A NEW TRIAL ON BACK PAY AND FRONT PAY.

If the Court allows at least some of the liability verdicts to stand, it should vacate the jury's back pay and front pay awards.  The jury's $6 million back pay award materially exceeds the only relevant evidence on back pay presented at trial.  And its $14 million front pay award contradicts Billesdon's subsequent employment history, which forecloses that remedy.  The Court should remand with instructions for the district court to grant Wells Fargo a new trial on damages unless Billesdon accepts a remittitur reducing the back pay award to $4,225,558 and the front pay award to $0.

**A.    The Jury's Back Pay Award Far Exceeds Any Amount Supported By The Record.**

**1.**    Where a damages award is challenged as excessive, this Court reviews "whether the jury's verdict is against the weight of the evidence or based on evidence which is false." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (internal quotation omitted).  That review requires a "comparison of the factual record and the verdict to determine their compatibility." *Cline*, 144 F.3d at 305.  Where a jury is presented with only "a clear back pay calculation" and "'specific'" testimony on that amount, upward departures constitute excessive damages.  *Staudner v. Robinson Aviation, Inc.*, 853 F. App'x 806, 811 (4th Cir. 2021) (per curiam) (quoting *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir. 1999)).

At trial, Billesdon presented the jury with evidence of a single, discrete back pay figure: $4,225,558.  His sole evidence on back pay consisted of testimony by his expert on economic damages, Dr. Moore.  JA0629-0630.  Dr. Moore testified using a demonstrative containing his supplemental economic report dated July 16, 2024.  JA0623-0626, JA0628-0630; *see* JA1354.  The report opined that "the back pay damages suffered by Mr. Billesdon are approximately $4,225,558," and it included

that same figure in the total "Net Loss" column in Table 2 within the report's subsection on "Back Pay." JA1356-1357. The report opined that Billesdon's front pay damages are "approximately $28,093,819," a figure also listed in the total column in Table 3. JA1360.

Dr. Moore presented his analysis from the report to the jury, explaining that he calculated Billesdon's "backpay" damages by analyzing Billesdon's earnings prior to his discharge, how much he would have earned had he remained at Wells Fargo, and subtracting certain offsets. JA0627. He then confirmed that Table 2 of the report (shown to the jury) contained his calculations of Billesdon's back pay damages—*i.e.*, "what his prior earnings and benefits less mitigation are during 2022, 2023 and up until the end of June 2024." JA0631. Table 3 of the report (also shown to the jury), Dr. Moore confirmed, contained his analysis of "front pay," JA0642, which considered the present value of what Billesdon's earnings "would have been at Wells Fargo" had he worked there until age 67, JA0631. Consistent with the amounts of back pay (approximately $4,225,558) and front pay (approximately $28,093,819) shown to the jury from his report, Dr. Moore testified that the total economic damages Billesdon incurred were $32,319,373. JA0631.

-55-

Billesdon's counsel then urged the jury during closing statements to adopt Dr. Moore's damages figures, identifying those calculations—and only those calculations—as "the evidence you can look at" to determine back pay and front pay. JA1201. As counsel put it, "the answer that we are asking for for the backpay is the number that Dr. Moore gave you. It's $4,225,558. That is the backpay lost for Mr. Billesdon." JA1201. Billesdon provided the jury no other back pay figure or evidence that could support a higher number.

Billesdon thus presented the jury with "a clear back pay calculation," *Staudner*, 853 F. App'x at 811, supported by testimony that "'was quite specific,'" *id.* (quoting *Koster*, 181 F.3d at 34); *see Koster*, 181 F.3d at 34 (noting plaintiff's attorney "in closing argument reiterated" the specific figure testified to at trial). The jury inexplicably exceeded the limits of that evidence by *more than $1.7 million*, awarding Billesdon $6 million in back pay. JA4077. Under this Court's precedents, a reasonable jury confronted with those circumstances cannot "conclude the plaintiff was damaged above and beyond what he said his damages were." *Staudner*, 853 F. App'x at 811 (quoting *Koster*, 181 F.3d at 34).

-56-

The $6 million back pay award is thus against the weight of the evidence and must be reduced accordingly.

2.    The district court's brief analysis of back pay in its post-trial order does not move the needle. Rather than compare the $6 million back pay award to the specific evidence Billesdon offered on back pay, the court reasoned that the case "involved highly compensated employe[e]s of a large national banking association." JA4200. But the general level of Billesdon's compensation is not a blank check for the jury to select any amount of back pay it feels like. Wells Fargo is not aware of any authority permitting untethered back pay awards simply because an employee is highly compensated. And here, Billesdon's "high[] compensation" is exactly what Dr. Moore purported to analyze when calculating back pay damages to be $4,225,558. *See* JA0631 (Dr. Moore calculating "what [Billesdon's] prior earnings and benefits less mitigation are during 2022, 2023 and up until the end of June 2024").

The district court sought to distinguish this Court's decision in *Staudner v. Robinson Aviation, Inc.*, on the theory that the jury in that case "was presented 'with a clear back pay calculation' of half that amount and plaintiff was foreclosed from seeking front pay." JA4200

(quoting *Staudner*, 853 F. App'x at 811).  Those observations about *Staudner* are true, but irrelevant.  As laid out above, Billesdon presented the jury with a crystal clear back pay calculation both through Dr. Moore's testimony and during closing statements.  The fact that the jury exceeded the amount in evidence by something less than double Billesdon's requested figure does not excuse the award's excessiveness.  What matters is the verdict and the record's "compatibility."  *Cline*, 144 F.3d at 305.  And here, the record contained no evidence of an additional $1.774 million of past wage loss—a substantial departure from Billesdon's requested amount by any measure.  Last, the unavailability of front pay in *Staudner* is a distinction without a difference because the jury awarded Billesdon back pay separately from front pay.  JA4077.

The district court also noted in passing that "Dr. Moore opined the value of economic damages in this case to be in excess of $32 million." JA4200.  But as Dr. Moore's walk with the jury through Tables 2 and 3 of his report shows, that total derived from adding back pay and front pay together.  JA0631; *see* JA1357-1360.  The jury then awarded back pay and front pay separately.  JA4077.  The $6 million back pay award

-58-

thus cannot be justified on the basis of Dr. Moore's grand total of damages.

**3.**     Billesdon's post-hoc attempts to justify the $6 million award fare no better.  In post-trial briefing below, he contended that the jury was free to go higher than Dr. Moore's figures because Dr. Moore said his calculations were "incredibly conservative."  JA4157.  But the part of the analysis Dr. Moore called "incredibly conservative" was his choice to keep Billesdon's hypothetical *future* benefits "flat" when calculating *front pay*. JA0651, *see* JA0650-0651 (Wells Fargo's counsel cross-examining Dr. Moore about Table 3 in his report).  He did not testify that his calculation of back pay was conservative, much less identify any discrete, evidentiary basis to add $1.774 million to past losses already measured.

Billesdon also argued in his post-trial briefing that Dr. Moore's back pay calculation "does not reflect the full bonus that was owed to Billesdon in 2024" because (1) that bonus was deferred compensation for 2023, yet (2) Dr. Moore supposedly split that bonus in half to account for the half of 2024 preceding the trial.  JA4157-4158.  Billesdon's premises are simply wrong.  Dr. Moore included Billesdon's 2023 bonus in the $2.6 million line item for 2023 itself, and the $1.3 million in the 2024 line item

represents half of Billesdon's hypothetical *2024* compensation. *See* JA1356-1357. The jury thus had no basis to conclude that Dr. Moore had somehow undercounted Billesdon's hypothetical 2024 pay.

Last, Billesdon defended the back pay award on the theory that the jury could have thought that his compensation had been trending up and that cost-of-living adjustments should be included. JA4158. In particular, Billesdon pointed out that his total compensation increased by $210,000 between 2019 and 2020 and by $225,000 between 2020 and 2021. JA4158. But those sorts of increases—even if hypothetically continued through the first half of 2024—come nowhere close to justifying $1.774 million in additional back pay, nor would speculative adjustments for cost-of-living.

Because no evidence supported that additional amount, this Court should remand with instructions for the district court to grant Wells Fargo a new trial on damages unless Billesdon accepts a remittitur reducing the back pay award to $4,225,558. *See Cline*, 144 F.3d at 306.

## B.    The Jury's Front Pay Award Is Foreclosed By Billesdon's Subsequent Employment History.

Front pay is an equitable alternative to reinstatement aimed at "provid[ing] resources to a wrongfully terminated plaintiff to… bridge a

-60-

time when the court concludes the plaintiff is reasonably likely to obtain other employment." *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018) (internal citation omitted). Front pay has a "potential for windfall, however," so "its use must be tempered." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). Because front pay is designed as a bridge between termination and new employment opportunities, it is not available where a plaintiff has already secured comparable work or has declined that work when offered. *See, e.g.*, *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998); *Dominic v. Consolidated Edison Co. of New York, Inc.*, 822 F.2d 1249, 1258 (2d Cir. 1987).

In *Dotson v. Pfizer, Inc.*, for example, a former Pfizer employee secured a verdict against the company for terminating his employment in violation of the Family and Medical Leave Act of 1993. 558 F.3d at 290. The employee had worked at Pfizer for approximately 15 years and had ascended the ranks to Regional Manager overseeing more than 100 sales representatives. *Id.* But by the time the court ruled on the plaintiff's request for front pay, he had secured other full-time employment in the pharmaceutical industry, "making approximately

$65,000 less than the approximately $232,000 in salary and benefits he made prior to his termination." *Id.* at 300. This Court affirmed the complete denial of front pay because the plaintiff "had secured comparable, if not precisely equivalent, work at another major drug company." *Id.*

Similarly, in *Dominic v. Consolidated Edison Co. of New York, Inc.*, the Second Circuit considered a cross-appeal from a decision reducing the amount of the plaintiff's front-pay award. 822 F.2d at 1251. The plaintiff contended that the district court had erroneously placed on him the burden of proving that he had mitigated damages when it determined he could find comparable employment within two years. *Id.* at 1258. The Second Circuit disagreed, explaining that the plaintiff misunderstood the role of the mitigation-of-damages issue: "Had [the employer] proved that [the plaintiff] failed to mitigate damages—for example, by refusing a substantially equivalent job … any front-pay award would have been foreclosed." *Id.* But even if the employer did not make that showing, the panel reasoned, the district court was still bound to evaluate "the plaintiff's ability to mitigate damages in the future." *Id.*

The logic of these decisions is simple: A plaintiff cannot decline a comparable opportunity—even if it is not precisely equivalent—or pivot to less remunerative arrangements and then demand the employer fund a multi-year stream of future losses that flow from the plaintiff's choices rather than the employer's unlawful act. *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 234-35 (1982) (explaining that imposing front pay after a plaintiff finds "substantially equivalent" work would provide "what amounts to a form of unemployment insurance" not intended by Congress).

Those principles foreclose front pay in this case. The record shows that Billesdon elected to leave his position at Brean Capital where he "was making more money" for a commission-only role at Academy Securities. JA0590; *see* JA4161 (conceding this fact in post-trial briefing). That decision—"refusing" a higher-paying job to take a lower one—breaks the chain connecting his discharge from Wells Fargo and any difference in future compensation. *Dominic*, 822 F.2d at 1258. Front pay cannot be used to insure a plaintiff against the financial consequences of voluntarily moving from comparatively stable investment-banking employment to a lower-guarantee, higher-volatility 100% commission

structure. *See* JA0590; JA1356. To hold otherwise would convert front pay into a subsidy for career choices untethered to the unlawful act and would contravene the duty to mitigate. *See Ford Motor Co.*, 458 U.S. at 234.

Moreover, Billesdon's employment at Brean Capital is itself an obstacle to front pay. *See* JA0580; JA0480-0481; JA0429-0430. He was paid a base salary at Brean and received compensation that, in Dr. Moore's view, materially mitigated his lost earnings: Dr. Moore credited $207,400 in 2022 and $250,000 in 2023 as mitigation from Brean in Table 2 of his supplemental report, and his report acknowledged that Brean would also pay commissions in the future. *See* JA1356-1357. That is precisely the sort of post-termination employment demonstrating continued viability in the market for comparable roles—even where compensation in one role is considerably lower. *See Dotson*, 558 F.3d at 300.

Billesdon cannot avoid that conclusion simply by putting the burden to show failure to mitigate on Wells Fargo. *See* JA4161-4162 (citing *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 148-49 (4th Cir. 2017)). The record itself carries that burden because it establishes that

Billesdon (1) obtained a position comparable, if not precisely equivalent, to his work at Wells Fargo, and (2) then left that position for a lower-paying job. *See Consol Energy*, 860 F.3d at 148 (describing burden of showing plaintiff was not "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged"). At bottom, Billesdon not only obtained comparable work but also declined to remain in it and instead chose a less remunerative path.

Because the trial record forecloses the jury's award of front pay, this Court should remand with instructions to grant a new trial on damages unless Billesdon accepts a remittitur reducing the front pay award to zero. *See Cline*, 144 F.3d at 306.

## III. THE DISTRICT COURT'S AWARD OF "CONTINU[ING]" STATE INTEREST SHOULD BE VACATED.

The district court amended the judgment to add 8% prejudgment interest on $6.1 million of the award under North Carolina law. JA4202-4203. But after identifying the relevant accrual period for the interest—March 14, 2023 to July 29, 2024—the court added that the interest "will continue until the judgment is satisfied under N.C. Gen. Stat. Section 24-

-65-

5(b)." JA4203. That addition of "continu[ing]" state interest *after* the date of the judgment was (likely inadvertent) error.

Interest accruing after the date of judgment is, by definition, *postjudgment* interest. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999) (distinguishing between prejudgment and postjudgment interest). By imposing interest "from the date the action is commenced until the judgment is satisfied," North Carolina General Statute § 24-5(b) addresses both prejudgment and postjudgment interest. But "it is well settled" that postjudgment interest in federal courts is governed by the federal postjudgment statute, 28 U.S.C. § 1961, and not state law. *Vandevender*, 756 F. App'x at 233 (citing *Forest Sales Corp. v. Bedingfield*, 881 F.2d 111, 113 (4th Cir. 1989)); *see Hitachi*, 166 F.3d at 633 (holding district court erred as a matter of law in applying state law rather than § 1961 to postjudgment interest).

The district court did not purport to address postjudgment interest, *see* JA4198-4203, so its reference to "continu[ing]" interest under North Carolina law was likely inadvertent. Indeed, the same judge has previously correctly applied state law to pre-judgment interest and § 1961 to post-judgment interest. *See, e.g.*, *Eschert v. City of Charlotte*,

-66-

No. 3:16-CV-295-FDW-DCK, 2017 WL 3840275, at *5 (W.D.N.C. Sept. 1, 2017); *Raynor v. G4S Secure Sols. (USA) Inc.*, 327 F. Supp. 3d 925, 951-52 (W.D.N.C. 2018).

Regardless of the cause of the error, though, this Court must correct it. The Court has repeatedly done so in other cases—even where the parties did not brief the issue below—because "[t]he award and rate of interest under [§ 1961(a)] is mandatory." *Vandevender*, 756 F. App'x at 233; *see Keyes L. Firm, LLC*, 2022 WL 3099848, at *4 n.6. The Court should do the same here by vacating the relevant portion of the amended judgment. The parties can then address any postjudgment interest in future proceedings before the district court.

## CONCLUSION

The Court should reverse and grant Wells Fargo judgment as a matter of law on all of Billesdon's claims because he failed to adduce sufficient evidence on an essential element of each of them. In the alternative, the Court should reverse for a new trial on those claims because the verdict on each count was contrary to the clear weight of the evidence. If the Court allows at least some of the liability verdicts to stand, it should vacate the back pay and front pay awards and remand with instructions to grant a new trial on damages, unless Billesdon accepts a remittitur reducing the back pay award to $4,225,558 and reducing the front pay award to $0. At the very least, the Court should vacate the portion of the amended judgment awarding "continu[ing]" interest under North Carolina law even after the date of the judgment.

Dated:  December 16, 2025

Respectfully submitted,

*/s/ Jeffrey R. Johnson*

Jeffrey R. Johnson
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
jeffreyjohnson@jonesday.com

Terri L. Chase
JONES DAY
600 Brickell Ave., Ste. 3300
Miami, FL 33131
(305) 714-9722
tlchase@jonesday.com

David Phillips
JONES DAY
4655 Executive Drive, Ste. 1500
San Diego, CA 92121
(858) 314-1121
davidphillips@jonesday.com

Christian Bashi
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3723
cbashi@jonesday.com

## STATEMENT REGARDING ORAL ARGUMENT

Wells Fargo respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and this Court's Local Rule 34(a). This appeal raises the sufficiency and weight of the evidence after a full jury trial. Oral argument would assist the Court's consideration of these issues in light of the record.

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with (1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,924 words excluding the portions exempted by Rule 32(f); and (2) the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in 14-point Century Schoolbook (a proportionally spaced typeface) using Microsoft Word.

Dated: December 16, 2025      By:    */s/ Jeffrey R. Johnson*
                                      Jeffrey R. Johnson

                                      *Counsel for Defendant-Appellant*
                                      *Wells Fargo Securities, LLC*

## CERTIFICATE OF SERVICE

I certify that on December 16, 2025, this Brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit through the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.


Dated:  December 16, 2025     By:     /s/ Jeffrey R. Johnson
                                      Jeffrey R. Johnson

                                      *Counsel for Defendant-Appellant*
                                      *Wells Fargo Securities, LLC*